RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 2 / 7 / 14

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


MARIE BERNADETTE ALEXANDER,          CIVIL ACTION
        Appellant                    NO. 1:13-CV-00081

VERSUS

CAROLYN W. COLVIN, ACTING            JUDGE DEE D. DRELL
COMMISSIONER OF SOCIAL SECURITY,[1]  MAGISTRATE JUDGE JAMES D. KIRK
        Appellee



## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


Marie Bernadette Alexander ("Alexander") filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on June 22, 2007, alleging a disability onset date of May 24, 2007 (Tr. pp. 201, 206)[2] due to "seizures, diabetes with complications, panic disorder" (Tr. p. 261).  Those applications were initially denied by the Social Security Administration ("SSA") (Tr. pp. 129).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on February 19, 2009 at which Alexander appeared with her

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.

[2] Alexander filed another application for SSI on April 29, 2009, alleging a disability onset date of April 10, 2009 (Tr. p. 253).  That application was also denied by the SSA (Tr. p. 168). Alexander did not appeal that ruling.

attorney, a witness, and a vocational expert ("VE") (Tr. p. 72).
The ALJ found that, although Alexander suffered from diabetes
mellitus with diabetic neuropathy and panic disorder without
agoraphobia, she had the residual functional capacity to perform
the full range of light work except that she can only stand for two
hours, she must avoid working at heights or around dangerous
machinery, can only occasionally perform over-the-shoulder work,
and can perform work involving no more than limited interaction
with the general public (but can deal with individuals) (Tr. pp.
119, 122).  The ALJ concluded that Alexander could work as a file
clerk or a general office clerk and, therefore, was not under a
disability as defined in the Social Security Act at any time from
May 24, 2007 through the date of his decision on April 13, 2009
(Tr. pp. 122-123).

Alexander requested a review of the ALJ's decision.  The
Appeals Council remanded Alexander's case to the ALJ, ordering him
to further evaluate Alexander's subjective complaints and the
credibility of third party testimony and provide rationale, obtain
evidence from a medical expert if necessary, and obtain
supplemental evidence from a vocational expert to clarify the
effect of Alexander's limitations on her occupational base (Tr. pp.
125-126).

On remand, the ALJ held a supplemental hearing on July 25,
2011 at which Alexander appeared with her attorney and a VE (Tr. p.
44).  The ALJ found that, although Alexander suffers from schizo-
affective disorder, anxiety disorder, cerebral and cerebellar

atrophy, diabetes, hypertension, seizure disorder, bilateral sural neuropathy affecting the lower extremities, and carpal tunnel syndrome (Tr. p. 24), she has the residual functional capacity to perform a modified range of light to sedentary work, and is able to lift/carry ten pounds frequently and 20 pounds occasionally, stand/walk two hours in a workday, sit six hours in a workday, can push/pull the weight she can lift/carry, can do work that is not complex and that requires only limited interaction with the public, and cannot work with hazards (Tr. p. 27).  The ALJ concluded that Alexander can work in jobs such as survey system monitor, egg processor and hand packager, and that Alexander was not under a disability at any time from May 24, 2007 through the date of decision on November 22, 2011 (Tr. p. 350).

Alexander again requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Alexander next filed this appeal for judicial review of the Commissioner's final decision.  Alexander raises the following issues for review on appeal:

> 1. The ALJ's discussion, of why he did not find that the claimant meets the requirements of Section 11.02 of Appendix 1 (the Listings), mischaracterizes the evidence and fails to satisfy the statutory reason-giving requirement discussed in Audler v. Astrue, 501 F.3d 446, 450 (5th Cir. 2007).

> 2. The ALJ also failed to comply with the reason giving requirement found in 20 C.F.R. § 404.1527, and he improperly rejected the restrictions assessed by the claimant's treating doctor without good cause.

3. The ALJ not only rejected the mental restrictions assessed by the treating source, he also rejected the opinions of both of the agency's examining mental health sources. As a result, no evidentiary choices exist which sufficiently support the ALJ's mental residual functional capacity finding.

4. Even if it had been within the ALJ's discretion to reject Drs. Brouillette, Quillin and Adams in favor of the mental capacity assessments by the non-examining agency reviewers, the Commissioner's burden to prove other jobs would nevertheless be unsatisfied because the ALJ did not accurately advise the vocational expert as to the mental restrictions assessed by Dr. Marsiglia or Dr. Spurrier, either.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or

mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

Alexander was 45 years old at the time of her supplemental hearing on July 25, 2011 (Tr. p. 47), has a college degree in child and family studies (Tr. p. 49), and has past relevant work as a technician at Crossroads Mental Health (2006-2007), an administrative assistant in a medical clinic (1997-2005), an admissions clerk in a hospital (2005-2006), a special education teacher (1995-1997), and a school teacher (1991-1995) (Tr. p. 378).

### 1. Medical Records

In July through November 2005, Alexander received mental health care to help manage her mood and improve her energy level (Tr. p. 948, 951).  Alexander admitted to sometimes noncompliance with her medications, and her sister reported in November that Alexander was sleeping 90% of the day (Tr. pp. 947-948, 950-951).

In December 2005, Alexander was found to have only fair control of her diabetes mellitus and she had gained weight, to she was told to increase her physical activity and reduce her caloric intake (Tr. p. 692).  In May 2006, Alexander's hypertension and seizures were stable, and her shoulder pain was treated with Tylenol; she had a full range of motion in her right shoulder  (Tr.

5

p. 719).   In November 2006, Alexander reported having diabetes mellitus for five years (Tr. p. 718).

In January 2007, Alexander was treated for one episode of hypoglycemia, after which she returned to work (Tr. pp. 492, 553).

Eye exams in May and July 2007 and January 2008 showed that Alexander may have glaucoma (Tr. pp. 541, 544, 549).

In June 2007, Alexander was treated for tremors, anxiety attacks, right shoulder pain, and diabetes mellitus (Tr. p. 547). A CT scan of Alexander's brain was normal (Tr. p. 589).

In September 2007, Alexander underwent a psychological examination with Dr. James W. Quillin, a neuropsychologist, who found she had a substantial history of depression and panic symptomatology, with persistently dysphoric moods, an impaired sleep pattern, poor appetite, poor energy level, limited interest and social interaction, crying spells, and passive death wishes (Tr. p. 504).  Dr. Quillin noted that Alexander has panic symptoms once or twice a week for ten to fifteen minutes, consisting of rapidly escalating anxiety, shaking, brief runs of tachycardia, shortness of breath, and a subjective sense that she is dying (Tr. p. 504).  Dr. Quillin also noted Alexander's medical history for grand mal seizures for which she takes Depakote, insulin dependent diabetes, and reportedly uncontrolled hypertension and further noted that she is being treated appropriately (Tr. pp. 504-505). Dr. Quillin found Alexander was depressed, anxious, had superficial insight, limited judgement functions, is able to understand and follow simple directions and instructions, she can read at the

sixth grade level, she can perform simple math, and her intellectual functions appeared to be low normal (Tr. p. 505). Dr. Quillin diagnosed depression, no otherwise specified and panic disorder without agoraphobia (Tr. p. 505). Dr. Quillin also found Alexander appears to have perceptual illusions but no true hallucinations, her ability to manage stress appeared to be compromised so she would have difficulty responding rapidly and appropriately in stressful conditions on a day to day basis, and she would need oversight managing any funds she might obtain (Tr. p. 505).

In a September 2007 Psychiatric Review Technique form, Dr. Cheryl Marsiglia, a psychologist who reviewed Alexander's medical records but did not evaluate Alexander, stated that Alexander has a mild restriction of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (Tr. pp. 506-518). Dr. Marsiglia further found, in a mental residual functional capacity assessment form, that Alexander has a moderate limitation in the ability to understand and remember detailed instructions, moderate limitations in the abilities to carry out detailed instructions and to maintain attention and concentration for extended periods, moderate limitations in the abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, moderate limitations in the ability to interact appropriately with the

general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and concluded that Alexander has the ability to do unskilled work in a routine work setting (Tr. pp. 520-522).

In March 2008, Alexander complained of tremors associated with pain in her right arm causing difficulty eating and writing (Tr. p. 540); Alexander reported having this problem for eight years (Tr. p. 540). Alexander reported that the pain starts at her shoulder and goes down her arm, and nothing relieves the pain (Tr. p. 540). An echocardiogram in March 2008 was normal (Tr. p. 661). An EEG in April 2008 was normal (Tr. p. 659).

In June 2008, both Alexander and her sister reported that she has increased shaking and pain in her right arm, pain in her right shoulder (sharp pain when she uses the shoulder), continues to have "small seizures," feels tired all the time but is awake most of the time, and she blacks out occasionally, according to her sister; Alexander stated that she is compliant with her insulin, Tramadol and BuSpar (Tr. p. 538). A nerve conduction study of Alexander's right arm in June 2008 showed right carpal tunnel syndrome (Tr. pp. 585-586, 813).

On July 21, 2008, Alexander again reported blacking out occasionally, her hand had started shaking, she had sharp pain in the shoulder joint and elbow, and during a "spell" she is frightened, crying, has an increased heart rate, and trouble breathing for about five minutes and then she feels normal again (Tr. pp. 537, 808). On July 23, 2008, Alexander's sister took her

8

to the emergency room for loss of consciousness for three to five minutes while riding as a passenger in a car; epilepsy or an adverse drug effect (to Tramadol) were alternative diagnoses (Tr. pp. 568, 801).  On July 29, 2008, Alexander went to the emergency room for hand pain (Tr. p. 555); she had some edema since she had an IV in her hand a few days before, so she was advised to massage it (Tr. pp. 557, 559).   Alexander's valproic acid level was 86.7MCG/ML in both July 24 and July 31, 2008 (Tr. pp. 573, 577).

Alexander's echocardiogram in August 2008 was normal (Tr. pp. 737, 815).  Also in August 2008, Alexander was found to be myopic and suspected of having glaucoma (Tr. p. 733).

In September 2008, Alexander reported that her right arm still shakes a lot and she was wearing an arm brace at night (Tr. p. 729).  Alexander also reported a "spell" in which she "blanked out" for three to five minutes (Tr. p. 731), and she was diagnosed with anxiety versus panic disorder (Tr. p. 730).   In October 2008, Alexander's Celexa was increased (Tr. p. 730).

In December 2008, Alexander complained of carpal tunnel syndrome in the right arm, hand tremors on the right, poor memory, anxiety with shortness of breath, shaking and crying, and pain in her right foot; she reported compliance with her wrist splint (Tr. p. 726).   She was diagnosed with diabetes mellitus II, hypertension, hyperlipidemia, and seizure disorder (Tr. p. 727). Alexander was prescribed Pamelor, Celexa, and BuSpar (Tr. p. 726). She was also advised to observed safety precautions due to her seizures (Tr. p. 727).

9

In June 2009, Alexander was evaluated by Dr. Trevor Richard, an internist (Tr. p. 818).  Dr. Richard found Alexander was 5'4" tall, weighed 208 pounds, her blood pressure was 150/98, her visual acuity was 20/25 in both eyes without correction, she had 5/5 strength bilaterally in all muscle groups, her reflexes were normal, and a right shoulder x-ray showed a minimally reduced glenohumeral joint space without bony abnormalities (Tr. pp. 819-820).  Dr. Richard diagnosed frozen shoulder syndrome on the right, anxiety, and a seizure disorder (Tr. p. 820).  Dr. Richard stated that Alexander should be able to sit, walk and/or stand for a full workday, hold a conversation, respond appropriately to questions, and carry out and remember instructions (Tr. p. 820).  Dr. Richard further stated that Alexander is limited in the use of her right arm due to frozen shoulder syndrome which needs to be treated, has a history of seizure disorder for which he did not have any medical records, and believed she needs psychiatric evaluation for hallucinations (Tr. p. 820).

In July 2009, Alexander underwent a psychological evaluation with Dr. John C. Simoneaux, a psychologist (Tr. p. 824).  Dr. Simoneaux noted that Alexander had previously received mental health treatment, including inpatient psychiatric treatment for depression and thoughts of suicide seven years earlier (Tr. pp. 824-825).  Dr. Simoneaux noted that Alexander reported a history of depression and anxiety for which she takes minimally beneficial medication, and that she has a seizure disorder for which she takes precautions.  Dr. Simoneaux found that Alexander appears to be able

to understand simple directions but may have trouble remembering even simple instructions, seems marginally able to carry out simple instructions, is not likely to carry out detailed instructions, her concentration is impaired when her anxiety level is heightened, she is able to relate to a fair degree socially and is not obviously inappropriate but is somewhat constricted, she appears able to interact with others at a superficial level, she seems able to maintain standards of neatness/cleanliness, her panic attacks and anxiety may be noticeable to others, she has difficulty tolerating stress, she is not likely to be able to respond well to changes in the work setting, and she may have some trouble setting goals and making plans independently of others (Tr. p. 826).  Dr. Simoneaux diagnosed depressive disorder NOS and anxiety disorder NOS with panic attacks at Axis I,[3] and stated that Alexander appears to be marginally able to manage funds (Tr. pp. 826-827).[4]

In April and July 2009, Alexander was diagnosed with

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

[4] A mental residual functional capacity assessment and psychiatric review technique form was filled out by someone who is not a psychologist or a psychiatrist (Tr. pp. 832-849). Therefore, it will not be considered by this court.
A physical residual functional capacity assessment was filled out by someone who is not a medical doctor (Tr. pp. 850-857), and therefore not an acceptable medical source.  Therefore it will not be considered by this court, either.  See 20 C.F.R. 404.1513; Porter v. Barnhart, 200 Fed.Appx. 317, 319 (5th Cir. 2006).

uncontrolled diabetes mellitus II, suboptimally controlled hypertension, and stable hyperlipidemia (Tr. pp. 753-754, 863-864). Alexander was prescribed Novolog, Cozaar, a diabetic diet, regular exercise, and insulin, and advised to follow up in the mental health clinic (Tr. p. 753). Alexander was also referred to an endocrinologist and was advised to count her carbs (Tr. pp. 783-784). In August 2009, Alexander's valproic acid level was 52.8 ug/mL (Tr. p. 860); that was noted to be a barely therapeutic level (Tr. pp. 872-873). In September 2009, it was noted that Alexander had two seizures in the past month and reported compliance with her medications (Tr. p. 778). Alexander weighed 207 pounds and her blood pressure was 150/86 (Tr. p. 778). Alexander also reported to the emergency room in September 2009 because her blood sugar exceeded 400; her last three meals had consisted almost entirely of carbohydrates, so she was instructed to eat fewer carbs and more vegetables (Tr. pp. 776-777, 889-890).

In January 2010, Alexander was evaluated by Dr. Steven Levine, a pediatric specialist, who found Alexander has (1) diabetes mellitus, probably type II, since 1995 that is being treated with metformin and insulin and that appeared to be under reasonably good control except for some early morning hypoglycemia, (2) seizure disorder, (3) hypertension, (4) hyperlipidemia, and (5) neuropathy that was relatively free of complications in her eyes and kidneys (and which may not be caused by her diabetes) (Tr. p. 900). Dr. Levine recommended reducing Alexander's insulin in the evening in response to her early morning hypoglycemia and taking aspirin

12

daily; Dr. Levine did not think Alexander is a good candidate for an insulin pump because she does not have good manual dexterity and is unable to provide herself with detailed self-care (Tr. p. 900).

In February 2010, Alexander's endocrinology report stated that her diabetes was less controlled than before and needed to be checked more often, she had not been watching her diet, her vitamin B12 was very low and could be related to her sensation problems in her extremities, and she was advised to take a baby aspirin every day (Tr. pp. 765, 907).  Also in February 2010, Alexander had two episodes of seizure activity and episodic left knee pain (Tr. pp. 768, 910).  X-rays of her left knee showed subtle changes of the proximal medical tibial that are probably from an old injury (Tr. p. 789).

In March, Alexander reported having three seizures that month (Tr. p. 939).  Alexander weighed 212 pounds, and the importance of diet and exercise was emphasized to her (Tr. pp. 939-940).

In May 2010, it was noted that Alexander had been cheating on her diet at night, and had retained fluid in her lower legs over the weekend, for which her sister gave her a fluid pill (Tr. p. 937).  Alexander was advised to decrease the sodium in her diet (Tr. p. 938).

Alexander was evaluated in the Avoyelles Mental Health Clinic in March 2010; Alexander reported depression, no energy, audio-visual hallucinations (which were found questionable), and very vague suicidal thoughts (Tr. pp. 956-960, 972-976).  The counselor noted that Alexander appeared to want sympathy for her medical

issues and money problems (Tr. p. 960).  In April, June and July 2010, Alexander was evaluated at the Avoyelles Mental Health Clinic by Dr. Rama Boppana, a psychiatrist, and diagnosed with schizoaffective disorder and depression (Tr. p. 965, 970, 976). Also in July 2010, Alexander said she was depressed, sleeping less, and having problems with her memory and seizures, but not having suicidal thoughts, she was calm and cooperative with good eye contact, and she denied auditory hallucinations but admitted visual hallucinations (Tr. p. 964); the pharmacy stated Alexander had not been filling her prescriptions (Tr. p. 964).  In August 2010, Alexander appeared to be confused about her medications, but a week later reported taking the correct dosages (Tr. p. 963).  In September 2010, Alexander reported taking her medication and eating well; APRN Ethridge reported that Alexander was calm and cooperative, oriented, her thinking was clear and goal-directed, and she denied hallucinations or paranoia (Tr. p. 963). Alexander's previous medications were discontinued, she was prescribed Risperdol, Paxil, Trazadone, and Buspar, and she was advised to follow a healthy diet and exercise (T. pp. 946, 962). In November 2010, Alexander admitted she had previously not been compliant with her medications but stated she was taking them now (Tr. p. 964).  In December 2010, RN Gauther noted that Alexander was sleeping okay most nights, her appetite was okay, her medications were helping, and she was getting out of her house more, staying busy, was more talkative, less anxious, shaking less, and less paranoid (Tr. p. 995).  Her medications were continued

14

(Tr. p. 995).

Alexander had a neurological evaluation in March 2010 with Dr. Morteza Shamsnia, a neurologist (Tr. pp. 989-991). Dr. Shamsnia was unable to classify Alexander's right hand tremor and scheduled her for tests (Tr. p. 991). An MRI of Alexander's brain in March 2010 showed advanced cerebral and cerebellar atrophy (Tr. p. 985). A nerve conduction study of Alexander's upper extremities in March 2010 showed bilateral carpal tunnel syndrome (Tr. p. 988). A nerve conduction study of Alexander's lower extremities in May 2010 showed bilateral sural neuropathies and absent H-reflexes that could be related to neuropathy versus bilateral S1 radiculopathies (Tr. p. 982). An EEG was normal (Tr. p. 992). A sleep study in April 2010 showed that Alexander has mild obstructive sleep apnea/hypopnea syndrome that was severe during REM sleep (Tr. pp. 9830984). Alexander had a CPAP study in June 2010; it was noted that she was 46 years old, 5'4" tall, and weighed 210 pounds (Tr. p. 979). The study showed obstructive respiratory events and snoring that were controlled with the CPAP and it was recommended that Alexander obtain a CPAP machine (Tr. p. 979).

In November 2010 and February 2011, Alexander reported that her blood sugar was variable, the highest being in the 300's, so her insulin was increased (Tr. pp. 1004-1007). In May 2011, Alexander's blood sugar was better, but she reported episodic chest pains and had an abnormal EKG (Tr. pp. 1003, 1009).

In March 2011, Dr. Beau Brouillette, a family medicine doctor who had been treating Alexander for almost two years for about two

years, wrote that Alexander has uncontrolled diabetes mellitus, seizures, hypertension, and anxiety, she became disabled before 2009 and is indefinitely disabled, her cardiac functional capacity is unlimited, she is physically capable of doing sedentary work, and her mental/nervous impairment makes her unable to engage in stressful situations or interpersonal relations (Tr. pp. 998-999). Dr. Brouillette also noted that Alexander is not a candidate for rehabilitation due to her anxiety and seizures (Tr. p. 999).

In June 2011, Alexander's seizures were noted to be relatively controlled, though she had a seizure during her last doctor visit, and her seizures preclude her from driving and affect her daily activities (Tr. p. 1011, 1023).

In September 2011, it was noted that Alexander's blood sugar had been ranging from 76 to 230 and that she had not been following her diet; also, her seizures were increasing in frequency (Tr. p. 1043). Alexander's weight was 202 pounds and her blood pressure was 120/78 (Tr. p. 1045). Alexander's valproic acid level was low at 39 mcg/mL (Tr. p. 1054). Alexander was referred to the neurology department for her seizures (Tr. p. 1046).

By January 2012, Alexander's blood sugar was even less controlled, running in a high range; although Alexander was complaint with her home glucose monitoring, medications and doctor visits, she was noncompliant with her diet (Tr. p. 1038). Alexander reported that she had a seizure the previous week but had not lost consciousness and her right hand was shaking a lot (Tr. pp. 1040). Alexander was advised to comply with her diet and avoid

16

extra carbs, start walking daily, avoid over use of her right hand,
apply cold compresses to her wrist, and wear a wrist splint at
night (Tr. p. 1041).

In April 2012, Alexander's valproic acid was at 53 mcg/mL (Tr.
p. 1048).

### 2. 2009 Administrative Hearing

At her February 2009 administrative hearing, Alexander
testified that she was 44 years old, 5'4" tall, weighed about 200
pounds, and is right-handed (Tr. p. 75). Alexander testified that
she lives with her sister in Marksville, Louisiana and does not
have any income (Tr. p. 76). Alexander's sister is a registered
nurse who works as a healthcare manager (Tr. p. 84). Alexander
testified that she stopped driving two or three years ago (Tr. p.
76). Alexander further testified that she has a four-year college
degree and taught at a parochial school for about four years, then
taught special education at a high school for about two years in
Avoyelles Parish, then worked as a receptionist at the England
Airpark in Alexandria, Louisiana, then worked at the Red River
Treatment Center in Pineville for about six months (sitting with
patients at night (Tr. pp. 77-78). Alexander testified that her
aunt drove her to and from work when she worked at the England
Airpark and the Red River Treatment Center (Tr. p. 78).
Alexander's aunt also drives her to her doctors' appointments (Tr.
p. 87). Alexander testified that she stopped working because of
her diabetes, seizures, anxiety, and panic attacks (Tr. p. 79).

Alexander testified that she takes insulin for her diabetes

and is on a diabetic diet, but has not lost weight because sometimes she eats candy when she has low blood sugar (Tr. p. 80). Alexander testified that she also tries to walk for exercise, but has trouble doing so due to pain in her right foot (Tr. p. 82). Alexander's sister, Nora, keeps a log of Alexander's blood sugar (Tr. p. 88). Alexander testified that, when her blood sugar is high, she is tired and has to lie down for one to two hours until it drops; her sister gives her more insulin when that happens (Tr. p. 89). Alexander testified that her blood sugar reaches at least 200 almost every day (Tr. p. 89), and her sister gives her extra insulin about three days a week (Tr. p. 91). Alexander testified that, when her blood sugar is between 200 and 250, she becomes tired, itchy, and hot, and has to lie down for about 45 minutes (Tr. p. 92). Alexander testified that she has to lie down with elevated blood sugar about once a week (Tr. p. 93).

Alexander testified that she has been taking Depakote for her seizures for about fifteen years; her last seizure was about a month ago (Tr. p. 80). Alexander testified that, during a seizure, she "blanks out," bites her tongue, and sometimes she uses the bathroom on herself, but sometimes her seizures are just staring spells that last four to five minutes (Tr. p. 81). After a seizure, Alexander is tired and achy, and sits for about thirty minutes (Tr. p. 91). Alexander admitted that she worked many years despite the seizures (Tr. p. 81).

Alexander also testified that she has tremors in her right arm and has difficulty holding things with her right hand (Tr. p. 82).

18

Alexander testified that she has had panic attacks for between five and ten years (Tr. p. 84). Alexander testified that, when she has a panic attack, she is "out of it," hyperventilates, breathes heavily, her heart beats fast, and her arms shake (Tr. p. 83).

Alexander testified that she does light chores around the house, such as folding clothes, doing laundry, dusting, and grocery shopping with her sister; Alexander carries light bags (Tr. pp. 83-85). Alexander testified that, during the day, she reads, says the rosary, does chores, and takes naps (Tr. pp. 84-85). Alexander testified that she has never married and does not have any children (Tr. p. 84). Alexander testified that she does not socialize or go to church.

Alexander testified that she cannot return to work because she feels tired when her blood sugar drops, and she has panic attacks (Tr. p. 84). Alexander testified that she has tried working since she has been sick, but she always gets sick, then is terminated for missing too much work (Tr. pp. 86-87). Alexander testified that her last job required her to sit and stay alert, and that her anxiety attacks interfered with that (Tr. p. 88).

Alexander testified that she cannot lift heavy objects because her right hand hurts and her shoulders shake a lot (Tr. p. 87). Alexander also testified that she cannot see very well due to moderate to severe non-proliferative diabetes retinopathy, and had that problem in 2006 (Tr. pp. 88, 90). Alexander testified that she has trouble writing, holding things, and gripping things because of diabetic neuropathy (Tr. p. 90). Alexander testified

that, if she had to sit at a desk forty hours a week, she would get tired, and her hands and arms would have tremors (Tr. p. 92).

Nora Vallian, Alexander's sister, testified that Alexander is a very brittle diabetic, she has seizures, and she has anxiety and panic disorder (Tr. p. 94). Vallian testified that she used to be an emergency room nurse at Huey P. Long Hospital (in Alexandria); when Vallian changed jobs, Alexander lost part of her transportation to her job at Red River Treatment Center (in Alexandria) (Tr. p. 98). Vallian testified that she measures Alexander's blood sugar several times a day; when it is high, she becomes disoriented and may lose consciousness (Tr. p. 94). Vallian testified that, when her problems started, she could still function, her mind was good, and she had clarity (Tr. p. 95). However, over the years, Alexander has deteriorated; after a seizure, she has no recollection after a seizure of the period up to an hour before the seizure; Alexander has seizures one or twice a month (Tr. p. 95). Vallian testified that Alexander was diagnosed with seizures in about 1985, but was able to work for many years after that diagnoses (Tr. p. 95). Vallian also testified that the tremor in Alexander's right arm has become more pronounced in the last four years (Tr. p. 96). Vallian testified that a neurologist told her Alexander' tremor is connected to her seizures and her panic disorder (Tr. p. 96).

Vallian also testified that, because of her diabetes, Alexander has a rigid schedule; she gets up at the same time every morning and takes her blood sugar, eats breakfast, then may do some

light housework (Tr. p. 96).  If Alexander is feeling well, she may walk her dog outside, then she'll eat (Tr. p. 96).  Vallian testified there will be periods in the day when Alexander has to rest, depending on her blood sugar, which changes rapidly (Tr. p. 96).  Vallian also testified that Alexander plays dominos once a week with a neighbor, sings in the church choir, and socializes with her aunt (Tr. p. 97).  Alexander's aunt drives her to her doctors' appointments (Tr. p. 97).

Vallian testified that Alexander is not able to work anymore because she sometimes becomes so disoriented due to her diabetes and seizures; Alexander lost her job as a sitter because she was not reliable due to health problems and missed too much work (Tr. pp. 99-100).  Vallian testified that Alexander's seizures and diabetes are gradually getting worse (Tr. p. 99).  Vallian testified that Alexander's day is interrupted by her diabetes, seizures, or panic attacks at least five times in three days (Tr. p. 100).  Vallian testified that Alexander has panic attacks about once every other day (Tr. p. 101).  Vallian further testified that Alexander alerts Vallian to the fact that her blood sugar is high (over 200) by telling her she is nauseated and feeling tired (Tr. p. 101).  Vallian testified that Alexander used to see a psychologist and receive counseling for her panic attacks and she takes medications, but she only sees a neurologist regularly (Tr. p. 102).

A Vocational Expert ("VE") testified at Alexander's hearing that Alexander's past work as an administrative assistant at a

medical clinic was sedentary work (DOT 169.1567-010, SVP 7), her
job as an admissions clerk at a hospital was sedentary (DOT
205.362-018, SVP 4), her job as an uncertified special education
teacher was light work (DOT 094.227-030, SVP 4 or 5), her job as an
uncertified teacher was light work (SVP 7, DOT 092.227-010), and
her work as a home health aide (sitter) was medium level (DOT
355.674-014, SVP 4) (Tr. p. 104).

    The ALJ posed a hypothetical involving a claimant of
Alexander's age, education, and work experience, who can lift and
carry up to 20 pounds occasionally and ten pounds frequently, can
stand and walk for about two hours, sit for about six hours, cannot
work at heights or around dangerous machinery because of her
seizure disorder, has some limitation in her field of vision in one
eye, cannot work around heights or dangerous machinery, can only
occasionally do over shoulder work, cannot do complex work, and can
only have limited interaction with the general public but can deal
with individuals (Tr. p. 105).  The VE testified that such a person
could work as a file clerk (Census Code 335, 25% of 298,520 jobs in
the nation and 25% of 3539 jobs in Louisiana) (Tr. p. 105).  The VE
testified that Alexander could not work as a receptionist, but
could do some general office clerk work, though there is not a
significant number of jobs in the economy (Census Code 370, 10% of
1,965,541 jobs nationally and 10% of 40,082 jobs in Louisiana) (Tr.
p. 106).  The VE testified that his percentage estimates are based
on his experience (Tr. p. 107).  The VE further testified that such
a claimant could not do any work if she had a panic attack every

other day or if her blood sugar was too high five times in three days, or even five times in a month, which significantly interfered with her ability to work (Tr. p. 106).  Finally, the VE testified that absenteeism of two or more days a month is beyond a level most employers would tolerate on an ongoing, sustained basis (Tr. p. 107).

### 3. 2011 Administrative Hearing

A supplemental hearing was held before an ALJ on July 25, 2011, at which Alexander appeared with another VE (Tr. p. 46). Alexander testified that she was 45 years old, right handed, 5'4" tall, weighed about 201 pounds, lived with her sister, did not have any income, and did not drive (Tr. p. 48).  Alexander testified that she last drove about one and a half years ago and had stopped for medical reasons (Tr. p. 48).  Alexander testified that she has a bachelor's degree in child and family studies, and can read, write and do basic arithmetic (Tr. p. 49).  Alexander testified that she had worked as a teacher, as a technician (monitoring patients) at Crossroads Mental Health, as an administrative assistant at Crossroads Mental Health and at the Red River Treatment Center, and as an admissions clerk a Huey P. Long Hospital (Tr. p. 50).  Alexander testified that she has not looked for a job since 2007, and does not think she can work (Tr. p. 50).

Alexander testified that she has about three seizures a week; during a seizure she falls on the floor and does not remember what happens, but sometimes she bites her tongue or lip (Tr. p. 51). Alexander does not go to the hospital when she has a seizure (Tr.

p. 51).  Alexander testified that her seizures just occur and are not precipitated by anything (Tr. p. 52).  Alexander testified that her seizure medication (Depakote) dosage has been increased and she takes it twice a day (Tr. p. 52).  Alexander also testified that she takes her insulin by shots twice a day (Tr. p. 53).

Alexander testified that she tries to walk her dogs, sits on a swing, goes to church on Sundays, and spends most of her time lying on the sofa watching TV (Tr. pp. 52-53).  Alexander testified that she cannot exercise because her legs hurt and her ankles are swollen some days (Tr. p. 53).  Alexander testified that her sister works as a home health administrator (Tr. p. 53).

Alexander testified that she has been taking insulin by injection for many years (Tr. p. 53).  Alexander also takes Risperdal and Buspirone for emotional problems; she is depressed all the time so she does not have much energy and likes to sit in her house (Tr. pp. 53-54).  Alexander testified that her sister cooks and she heats up food in the microwave, she does not do laundry, and sometimes she shops for groceries with her sister and can carry light bags (Tr. p. 54).  Alexander testified that she goes to the mental health clinic once a month; a home health worker drives her there (Tr. p. 55).  Alexander also testified that, pursuant to her doctor's orders, someone goes to her home every day and assists her with housework, such as laundry, and has done so for about two years (Tr. pp. 55-56, 61).

Alexander testified that she has not worked since her disability onset date of May 24, 2007 (Tr. p. 58).  Alexander

24

testified that she stopped teaching because she had "spells" at work, and the children would have to be removed from the classroom (Tr. p. 56). Alexander testified that she started having seizures before she started teaching, but stopped teaching when the seizures interfered with her job (Tr. p 63). Alexander testified that she stopped working in Alexandria of the driving involved (Tr. p. 56).

Alexander testified that she still has tremors that occur randomly in her right hand and sometimes in her right arm (Tr. pp. 57-58). The tremors affect Alexander's ability to hold things, catch things, write, pick up things, button clothing, turn a page in a book, and generally use her right hand (Tr. p. 59). Alexander testified that she also still has moderate to severe non-proliferative diabetes retinopathy, caused by her diabetes, that affects her vision (Tr. p. 58). Alexander testified that she still has neuropathy, and that her advanced cerebral and cerebella atrophy cause problems with her memory (Tr. pp. 59-60). Alexander testified that her neuropathy/hand tremors started in 2004 or 2005 (Tr. p. 64). Alexander testified that she likes to work crossword puzzles and read the news on the computer (Tr. p. 57).

Alexander testified that she and her sister keep a diary of her daily blood sugar and her seizures (Tr. p. 62). Alexander testified that, when her blood sugar reaches around 200, she feels queasy and tired, but her sister gives her additional insulin and she lays down for about 30 minutes, until she feels better (Tr. p. 62). Alexander testified that her diabetes was about the same in 2007 and 2008 as it is now (Tr. p. 64). Alexander testified that

her seizures have increased somewhat in frequency since 2009 (Tr. p. 63). Alexander testified that she had about three seizures a week in 2007 and 2008 (Tr. p. 64). Alexander testified that, during a seizure, she typically falls out, shakes, talks and stutters, does not remember what happened and is confused (Tr. p. 64). Afterward, Alexander needs one and a half to two hours to recover from the seizure (Tr. p. 69).

The VE testified that Alexander's past work as a special education teacher was light work, SVP 7 and skilled, her past work as an administrative assistant was sedentary work and SVP 7, her past work as an admissions clerk was sedentary work and SVP 4, and her past work as a medical technician (observing patients), or ward attendant or chemical dependency attendant, was medium work, SVP 4 and semiskilled (Tr. pp. 66-67).

The ALJ posed a hypothetical involving a claimant of Alexander's age, education and work experience, who can lift and carry 20 pounds occasionally and ten pounds frequently, can stand and walk for about two hours, can sit for six hours, cannot be exposed to hazards such as dangerous machinery or unprotected heights, cannot do complex work, requires limited interaction with the general public, and is more comfortable working with things rather than with people (Tr. p. 67). The VE testified that such a person could do sedentary, unskilled, noncomplex work such as surveillance system monitor (Census Code 395, SOC 33-9099, sedentary, unskilled, 5000 jobs in the national economy), egg processor (Census Code 896, SOC 51-9199, unskilled, sedentary, 3000

jobs in the national economy), or hand packager (Census Code 964, SOC 53-7064, unskilled, sedentary, about 1000 jobs in the national economy).

The VE further testified that, if the claimant has seizures three times a week, or three times a month, and cannot work on those days, she would not be able to work because she would not be able to get that much time off (Tr. p. 68).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Alexander (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is

satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

On April 13, 2009, in the case at bar, the ALJ found that Alexander has not engaged in substantial gainful activity since May 24, 2007, and that she has severe impairments of diabetes mellitus with diabetic neuropathy, and panic disorder without agoraphobia, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 117). The ALJ also found that Alexander is unable to perform any of her past relevant work (Tr. p. 121).

At Step No. 5 of the sequential process, the ALJ further found that Alexander has the residual functional capacity to perform light work except that she can only stand for two hours and, due to a possible seizure disorder and some limitation of her field of vision in one eye, she must avoid working at heights or around dangerous machinery, she can only occasionally perform over-the-shoulder work, and, because of mental limitations, she cannot perform complex tasks but is able to perform work requiring limited interaction with the public, where she can deal with individuals but is limited in her interaction with the general public (Tr. p. 119). The ALJ found that the claimant is a younger individual with at least a high school education, and that transferability of work skills is not material to the disability determination (Tr. pp. 20-21). The ALJ concluded that there are a significant number of jobs in the national economy which Alexander can perform, such as file

clerk and general office clerk and, therefore, Alexander was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on April 13, 2009 (Tr. p. 123).

Alexander requested a review of the ALJ's decision. The Appeals Council granted her request, vacated the ALJ's decision, noting that, since there are no job numbers published in connection with either job census code, the ALJ failed to establish by reliable evidence that jobs exist in significant numbers in the regional or national economies that Alexander can perform, and that the ALJ failed to address the testimony by Alexander's sister, Vallian, and provide sufficient reasons for discrediting her testimony (Tr. p. 125). The Appeals Council remanded the case to the ALJ instructions for the ALJ to further evaluate Alexander's subjective complaints and the credibility of third party testimony and provide rationale, to obtain, if necessary, evidence from a medical expert (neurologist or internist) to clarify the nature and severity of Alexander's impairments, and to obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on Alexander's job base and to resolve any conflicts between the occupational evidence and information in the Dictionary of Occupational Titles and the Selected Characteristics of Occupations (Tr. pp. 125-126).

On remand, on November 22, 2011, the ALJ found that Alexander met the insured status requirements for DIB through June 30, 2008, she had not worked since Mary 24, 2007, and she has severe

29

impairments of schizoaffective disorder, anxiety disorder, cerebral and cerebellar atrophy, diabetes, hypertension, seizure disorder, bilateral sural neuropathy affecting the lower extremities, and carpal tunnel syndrome (Tr. p. 24), but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 125).  The ALJ also found that Alexander is unable to perform any of her past relevant work (Tr. p. 34).

At Step No. 5 of the sequential process, the ALJ further found that Alexander has the residual functional capacity to perform a modified range of light to sedentary work, providing that she can only lift and carry ten pounds frequently and twenty pounds occasionally, stand and walk for two hours in a work day, sit for six hours in a workday, her ability to push and pull is limited by the weight she is able to lift and carry, she must avoid working around hazards, she cannot perform complex work, and she can have only limited interaction with the general public (Tr. p. 27).  The ALJ found that the claimant is a younger individual (age 45-49) with at least a high school education, and that transferability of work skills is not material to the disability determination (Tr. p. 34).  The ALJ concluded that there are a significant number of jobs in the national economy which Alexander can perform, such as survey system monitor, egg processor, and hand packager and, therefore, Alexander was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on April 13, 2009 (Tr. p. 35).

Alexander requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security.

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is

31

for the Commissioner and the ALJ, rather than the court. <u>Allen v.</u>
<u>Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v.</u>
<u>Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have
authority, however, to set aside factual findings which are not
supported by substantial evidence and to correct errors of law.
<u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial
evidence does not exist, a court must conclude that there is a
"conspicuous absence of credible choices" or "no contrary medical
evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988);
<u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Listing 11.02</u>

First, Alexander argues that the ALJ's discussion of why he
did not find that the claimant meets the requirements of Section
11.02 of Appendix 1 (the Listings) mischaracterizes the evidence
and fails to satisfy the statutory reason-giving requirement
discussed in <u>Audler v. Astrue</u>, 501 F.3d 446, 450 (5th Cir. 2007).

<u>Audler</u>, 501 F.3d at 448, holds that, at Step 3, if the ALJ
does not identify the listed impairment for which the claimant's
symptoms fail to qualify, or provide any explanation as to how he
reached the conclusion that the claimant's symptoms are
insufficiently severe to meet any listed impairment, such a bare
conclusion is beyond meaningful judicial review.   However,
procedural perfection in administrative proceedings is not required
as long as the substantial rights of a party have not been
affected. <u>Audler</u>, 501 F.3d at 448, citing <u>Mays v. Bowen</u>, 837, F.2d

32

1362, 1364 (5ᵗʰ Cir. 1988).

In the case at bar, the ALJ found that Alexander does not meet a listed impairment, and discussed Listing 11.02 (Tr. p. 25).  The ALJ found Alexander did not meet Listing 11.02 (convulsive epilepsy) because she did not provide a physician's description of a typical seizure or any testimony, other than her own concerning her seizures (Tr. p. 25).

Listing 11.02 states:

11.02 Epilepsy-convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. WITH:
A. Daytime episodes (loss of consciousness and convulsive seizures) or
B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

Listing 11.00(A) further provides that the degree of the epilepsy impairment

"will be determined according to type, frequency, duration, and sequelae of seizures.  At least one detailed description of a typical seizure is required. Such description includes the presence of absence or aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information.  Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

"Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drubs

drubs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels."

The ALJ found, as to Alexander's seizures, that since Alexander had not submitted a physician's description of her typical seizure, and no testimony other than Alexander's had been submitted, she had not shown that she meets Listing 11.02 (Tr. p. 25).

Dr. Brouillette witnessed one of Alexander's seizures, and stated that, during the seizure, Alexander sat in a chair for about three minutes, without loss of consciousness or incontinence, then was able to walk out of the room (Tr. p. 1016). Apparently the ALJ missed that in the record. There is also a physician's description of one of Alexander's epileptic seizures, as related by her sister, Vallian, in a July 2008 emergency room record (Tr. p. 566). The physician wrote that, while riding as a passenger in the car, Alexander initially babbled without making sense, then "lost consciousness"-her eyes were open but she was nonresponsive for about 3-5 minutes (Tr. p. 566).

The ALJ erred in failing to note that Vallian had testified at the first hearing regarding Alexander's seizures. Vallian testified at the 2009 hearing that Alexander has one or two seizures a month and has no recollection after a seizure occurs for the period of time up to an hour before the seizure (Tr. p. 95). The ALJ also erred in finding Vallian's testimony at the second hearing was unnecessary because it would be "cumulative" (Tr. pp.

61, 65).  At a hearing before an ALJ, "[a]ny party to a hearing has a right to appear before the administrative law judge...to present evidence and to state his or her position. ...Witnesses may appear at a hearing in person...[and] [t]hey shall testify under oath or affirmation. ...The administrative law judge may ask the witnesses any questions material to the issues and shall allow the parties or their designated representatives to do so."  20 C.F.R. §§ 404.950, 416.1429.  The right to a fair hearing encompasses the right to present evidence and cross-examine witnesses.  See Lidy v. Sullivan, 911 F.2d 1075, 1077 (5th Cir. 1990), cert. den., 500 U.S. 959, 111 S.Ct. 2274 (1991).  Therefore, the ALJ erred in finding Vallian's testimony would be "cumulative" and not allowing her to testify at the second hearing.  The ALJ compounded that error by finding Alexander did not meet Listing 11.02 because she did not have any evidence as to the nature and frequency of her seizures other than her own.

There is also a record of Alexander's valproic acid level (from her Depakote): in July 2008 it was 86.7mcg/mL (Tr. p. 573); in August 2009 it was 52.8 ug/mL (Tr. p. 860), which was a barely therapeutic level (Tr. pp. 872-873); in September 2011, Alexander's valproic acid level was 39 mcg/mL (Tr. p. 1054); in April 2012, Alexander's valproic acid was 53 mcg/mL (Tr. p. 1048).

The ALJ found that Alexander's contention that she suffers from about seven seizures a month was not credible.  However, Listing 11.02 requires that the claimant have only one seizure per month despite having had at least three months of treatment.

35

Therefore, the ALJ's finding was not relevant to the determination of whether Alexander meets Listing 11.02.

However, it is clear that Alexander does not suffer from listing-level seizures because Listing 11.02 requires daytime episodes involving loss of consciousness and convulsive seizures. There is no evidence that Alexander has convulsions during a seizure. Therefore, Alexander has not carried her burden of proving she meets Listing 11.02.

Listing 11.03 provides the criteria for nonconvulsive epilepsy, which is what Alexander appears to suffer from:

> 11.03 Epilepsy-nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Since the evidence does not indicate that Alexander suffers from seizures more often than once a week,[5] Alexander did not carry her

---

[5] The medical evidence of Alexander's seizures did not indicate she has more than one seizure per week. A seizure was reported in June 2007 (Doc. 498); her valproic acid level was 52.1 (Tr. p. 502). In July 2008, Vallian took Alexander to the emergency room immediately after a seizure (Tr. p. 562); Vallian's valproic acid level was 86.7 (Tr. p. 577). On August 22, 2008, Alexander reported a recent seizure (Tr. p. 732). On September 8, 2008, Alexander reported having had one "spell" since her last visit on August 22, 2008, in which she "blanked out" for three to five minutes(Tr. pp. 731, 798). On December 28, 2008, Alexander reported that she was doing well on her seizure medication (Tr. p. 796). In April 2009, Alexander reported having seizures frequently (Tr. p. 754). On July 29, 2009, Alexander reported a seizure in the last two days (Tr. p. 783). On September 21, 2009, Alexander reported having two seizures since her visit on August 13, 2009 (Tr. p. 780). In December 2009, Alexander reported she was still having seizures,

burden of proving she meets Listing 11.03.

Alexander has not shown prejudice arising from the errors made by the ALJ.   Therefore, substantial evidence supports the Commissioner's conclusion that Alexander does not meet Listing 11.02 or Listing 11.03.   This issue is meritless.

Issue 2 - Functional Limitations

Next, Alexander contends the ALJ failed to comply with the reason-giving requirement found in 20 C.F.R. § 404.1527, and improperly rejected the restrictions assessed by the claimant's treating doctor, Dr. Brouillette, without good cause.

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity.   20 C.F.R. § 404.1546, § 416.946.   The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination.   SSR 96-8p.   When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or

_____

the last one a few days ago (Tr. p. 770).   In February 2010, Alexander reported two very brief episodes of seizure activity (Tr. p. 768).   In March 2010, at a neurological consult, Alexander's seizures were reported as "variable" (Tr. p. 989). On June 8, 2011, Alexander had a seizure when she was about to leave the room after an appointment with Dr. Brouillette (Tr. p. 1016).   In September 2011, Alexander reported that her seizures were increasing in frequency, but she did not have loss of consciousness, weakness, numbness, dizziness or headaches (Tr. p. 1043); her valproic acid level was only 39 (Tr. p. 1054).   In January 2012, Alexander reported having seizures without loss of consciousness, weakness, numbness, dizziness or headaches, the last one a week before (Tr. p. 1040).   In April 2012, Alexander's valproic acid level was 53 (Tr. p. 1048).

disability testified to by the claimant or others.  20 C.F.R. § 404.1545(a).  Moreover, the ALJ must specify the evidentiary basis for his RFC determination.  SSR 96-8p.  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

In the case at bar, the ALJ found that Alexander suffers from "severe"[6] schizoaffective disorder, anxiety disorder, cerebral and cerebellar atrophy, diabetes, hypertension, seizure disorder, bilateral sural neuropathy affecting the lower extremities, and carpal tunnel syndrome, each of which affect her ability to work. The ALJ found that Alexander has functional limitations, so she can perform a modified range of sedentary to light work (lift/carry 10 pounds frequently and 20 pounds occasionally), she can stand/walk for up to two hours in a workday, sit six hours in a workday, push/pull up to 10 pounds frequently and 10 pounds occasionally, she cannot perform work that is complex, she must avoid working at heights or around dangerous machinery, she can have only limited interaction with the public, she can perform work that is not complex (Tr. p. 27).

In March 2011, Dr. Beau Brouillette stated that Alexander's cardiac functional capacity is unlimited, she is physically capable of doing sedentary work, her mental/nervous impairment makes her unable to engage in stressful situations or interpersonal

---

[6] In Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), the Fifth Circuit noted that an impairment can be considered as not "severe" only if it is a slight abnormality which has such a minimal effect on the claimant that it would not affect his ability to work, and construed that to mean that some impairments are so slight that the ability of the claimant to work can be decided without a full evaluation of vocational factors.

relations, she is unable to do her usual work, and she is not a candidate for rehabilitation due to her anxiety and seizures (Tr. pp. 998-999).   Dr. Brouillette did not state that Alexander is completely unable to work, but only indicated that she is unable to return to her former work.   Alexander correctly contends the ALJ did not discuss the functional restrictions imposed by Dr. Brouillette.   However, Alexander has not shown any prejudice arising from that failure, since Dr. Brouillette did not find Alexander is completely disabled from all work.

The ALJ found that Alexander cannot do any of her former work, but can do a limited range of sedentary to light work.   Since the ALJ's findings as to Alexander's residual functional capacity appear to comport with Dr. Brouillette's opinion, the ALJ did not reject Dr. Brouillette's restrictions.

This issue is meritless.

Issue 3 - Mental Functional Limitations

Next, Alexander contends the ALJ failed to include her mental limitations in his hypothetical to the VE.

Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, a determination of nondisability based on such a defective question cannot stand.   Boyd v. Apfel, 239 F.3d

698, 706-707 (5th Cir. 2001), citing <u>Bowling v. Shalala</u>, 36 F.3d
431, 436 (5th Cir. 1994).

Since the ALJ found Alexander's impairments (schizoaffective
disorder, anxiety disorder, cerebral and cerebellar atrophy,
diabetes, hypertension, seizure disorder, bilateral sural
neuropathy affecting the lower extremities, and carpal tunnel
syndrome) are "severe" because they affected her ability to work,
he was required to include the functional limitations caused by
each of her impairments.  The ALJ found that, due to Alexander's
mental limitations, she can only perform work that is not complex
and that requires only limited interaction with the public (Tr. p.
27).

The ALJ found that Alexander has severe mental impairments of
schizoaffective disorder, anxiety disorder, and cerebral and
cerebellar atrophy (Tr. p. 24).  The ALJ discussed Alexander's
depression, finding that proper treatment after 2009 "appear[ed]
to permit a much higher level of functioning than was presented to
the consultative examiners in 2007 and 2009" (Tr. p. 32).  The ALJ
also found that, while "advanced cerebral and cerebellar atrophy...
can be indicative of a degenerative process affecting brain
functioning... the totality of the evidence in this case... does
not show [Alexander] to be completely disabled due to problems with
mental functioning" (Tr. p. 33).  The ALJ stated that Alexander's
claim of poor memory affecting her ability to work was not
supported by the medical evidence (Tr. p. 33).

Alexander's depression (from her schizoaffective disorder) was

diagnosed by Dr. Boppana (Alexander's treating psychiatrist),[7] Dr. Quillin, and Dr. Simoneaux.    The ALJ found that, with the medication and counseling that began in 2010, Alexander's depression was not severe.

Alexander contends she is unable to engage in stressful situations and interpersonal relations.  Dr. Quillin stated that Alexander would have difficulty responding rapidly and appropriately in stressful conditions on a day to day basis (Tr. p. 505).  Dr. Simoneaux stated that Alexander is able to understand simple directions but may have trouble remembering simple instructions, is marginally able to carry out simple instructions, is not likely to carry out detailed instructions, her concentration is impaired when her anxiety level is heightened, she is able to relate to a fair degree socially and is able to interact with others at a superficial level, she is able to maintain standards of neatness/cleanliness, her panic attacks and anxiety may be noticeable to others, she has difficulty tolerating stress, and she is not likely to be able to respond well to changes in the work setting (Tr. p. 826).

The ALJ found that Alexander cannot perform complex work and can have only limited interaction with the public.  The apparent difference between Alexander's contention and the ALJ's finding is one of degree; the ALJ included Alexander's limitations in

---

[7] Alexander contends the ALJ relied on notes made by a counselor in 2005, Jack Etheridge (Tr. p. 963).  Alexander's primary psychiatrist was Dr. Boppana.  The ALJ appears to have relied primarily on the 2010 treatment notes from Dr. Boppana, Dr. Alla (another psychiatrist), and counselors (Tr. pp. 963-.

stressful situations and interactions with the public in the hypothetical to the VE.   Although Alexander contends that her limitations in functioning in stressful situations and in interacting with the public preclude all work, no doctor has stated that she cannot do any type of work due to mental limitations. Therefore, the ALJ did not err in finding that Alexander's mental limitations do not prevent her from doing some type of work.[8]

This issue is also meritless.

<u>Issue 4 - Hypothetical to the VE</u>

Alexander argues that, even if it was within the ALJ's discretion to reject the opinions of Drs. Brouillette, Quillin and Adams in favor of the mental capacity assessments by the non-examining agency reviewers (Spurrier and Marsiglia), the Commissioner's burden to prove there are jobs which Alexander can perform would nevertheless be unsatisfied because the ALJ did not accurately advise the vocational expert as to the mental restrictions assessed by Cheryl Marsiglia, Ph.D. or Jack Spurrier, Ed.D., the two non-examining consultants who evaluated Alexander.

---

[8] Alexander also contends the ALJ erred in relying on the opinion of non-examining consultant Jack Spurrier, Ed.D. (Tr. p. 27).  However, the ALJ appears to have relied on Spurrier's opinion only to find Alexander did not meet a listing; the ALJ did not mention Spurrier when he discussed Alexander's mental residual functional capacity.  It is noted that Spurrier holds himself out as a psychologist, but he is licensed to practice in Texas and not in Louisiana.  Spurrier holds a doctorate in education which does not qualify him to be licensed as a psychologist in Louisiana, and there is no curriculuum vitae in the record to indicate his experience practicing psychology in Texas.  Compare, <u>Vaughn v. Colvin</u>, 2013 WL 5519680, *5 (N.D.Ala. 2013)(a licensed professional counselor and vocational rehabilitation expert with a doctorate in education is not an acceptable medical source under the Regulations).

Alexander contends that, since the ALJ relied on Marsiglia's and Spurrier's assessment of her mental functional capacity, the hypothetical to the VE should have included moderate limitations in her ability to maintain attention and concentration for extended periods, moderate limitations in her ability to complete a normal workday without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, moderate limitations in her ability to interact appropriately with the general public, moderate limitations in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, moderate limitation in her ability to sustain an ordinary routine without special supervision, and moderate limitation in her ability to set realistic goals or make plans independently of others.

The ALJ did not refer to either Spurrier's or Marsiglia's assessments when he discussed his findings as to Alexander's mental residual functional capacity.  Instead, the ALJ relied on the records from her treating psychiatrists and the counselors at the Avoyelles Mental Health Clinic.

Alexander also contends the ALJ substituted his own, inexpert opinion for those of the medical experts when he found Alexander appeared to have a higher level of functioning than was present when she was examined by Dr. Quillin and Dr. Simoneaux in 2007 and 2009.  The ALJ explained that statement by pointing out that Alexander was receiving mental health treatment (counseling and medication) in 2010, the mental health care records indicated that

43

her mental functioning was improved, and she functioned well at the 2011 administrative hearing (Tr. p. 33).

Alexander has not pointed to any opinion by a mental health professional that shows she is unable to do any type of work. Substantial evidence supports the Commissioner's finding that Alexander can perform some types of work despite her mental limitations.  This issue is also meritless.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Alexander's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ___ day of February 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

45